STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Johnnie CARPRUE, Defendant-Appellant.

Supreme Court

*No. 02–2781–CR. Oral argument January 14, 2003.—Decided July 9, 2004.*

2004 WI 111

(Also reported in 683 N.W.2d 31.)

For the plaintiff-respondent-petitioner the cause was argued by *Alan Lee,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

For the defendant-appellant there was a brief by *Stephanie G. Rapkin,* Mequon, and oral argument by *Stephanie G. Rapkin.*

¶ 1. DAVID T. PROSSER, J. The State seeks review of a published decision of the court of appeals that reversed Johnnie Carprue's (Carprue) conviction for second-degree sexual assault.[1] The court of appeals concluded that the conviction had to be reversed because Carprue was denied due process by a circuit judge who appeared partial to the prosecution. *State v. Carprue,* 2003 WI App 148, 266 Wis. 2d 168, 667 N.W.2d 800. We conclude that when this case is analyzed in light of appropriate legal principles and standards, the result compelled by the court of appeals does not hold. While prudence would have counseled less assertive conduct from the circuit judge, the law does not demand a reversal of Carprue's conviction.

¶ 2. To decide this matter, we reflect on judicial authority to call and interrogate witnesses at trial, the limitations to that authority, and how abuse of that authority in a criminal trial may impact a defendant's due process rights. Carprue asserts that the circuit judge presiding over his trial abused her authority, and, as a result, denied Carprue his constitutional right to a fair trial. In addition, Carprue brings an ineffective

---

[1] Wis. Stat. § 940.225(2)(a) (2001–02). All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

assistance of counsel claim predicated on his trial attorney's failure to object to the circuit judge's actions.

¶ 3. The State argues, and we agree, that while the circuit judge's actions were inadvisable, the defendant has failed to demonstrate he is entitled to reversal of his conviction under any applicable legal theory. Accordingly, we reverse.

## FACTS AND PROCEDURAL HISTORY

¶ 4. Johnnie Carprue was released from the Milwaukee House of Correction (HOC) on May 9, 2001. A day later, Carprue was taken into custody on a charge of second-degree sexual assault. The trial on this charge was held between August 29 and September 4, 2001, in the Milwaukee County Circuit Court, Jacqueline D. Schellinger, Judge.

¶ 5. The complaining witness, T.B., and Carprue provide sometimes similar, sometimes vastly different accounts of the events · that transpired following Carprue's release. Both agree that T.B. became acquainted with Carprue through her sister's boyfriend, who was also serving time in the HOC. While Carprue was confined at HOC, his communication with T.B. was primarily by telephone, although T.B. visited Carprue on two or three occasions and also saw him at a court appearance.

¶ 6. As Carprue's release date drew near, he needed a place to stay. Because Carprue was to be a subject of "in-house" monitoring under the auspices of In-House Correctional Services, he was required to have a fixed address for monitoring purposes. Carprue attempted to make living arrangements with his aunt, but the arrangements fell through. T.B. offered Carprue a place to stay, even though she had only recently

moved to Milwaukee and was living with her sister. Carprue accepted, and when he was released on the afternoon of May 9th, he was taken to T.B.'s sister's residence.

¶ 7. Carprue did not stay at that address long. The sister's boyfriend did not want him there. Carprue left, he called T.B. later that evening, and the two agreed to meet. Ultimately, they proceeded to Carprue's aunt's residence.

¶ 8. At this point, the accounts begin to diverge. T.B. testified that when they arrived at the aunt's residence, they watched a movie in the living room. She indicated she fell asleep during the movie and woke up a few hours later to braid Carprue's cousin's hair before he left for school. She testified that she and Carprue did not engage in physical contact of a sexual nature up to that point.

¶ 9. Carprue offers a different version of how the two spent the late evening and early morning hours of May 9th and 10th. Carprue testified that the two were in the living room for only a brief period. During that time, the two were "kissing and hugging," and T.B.'s pants were unbuttoned. When Carprue's aunt entered from outside, Carprue threw his coat over T.B. so that she could fasten her pants. At about 3:30 in the morning, Carprue and T.B. then entered a bedroom where Carprue's cousin and a friend were playing video games. Carprue testified that during the time in the bedroom with the others, he was fondling T.B.'s vagina without objection, and that her pants were again unbuttoned.

¶ 10. Despite the inconsistencies in their testimony, both Carprue and T.B. recount that around 5:00

a.m., T.B. braided Carprue's cousin's hair. Both agree that thereafter T.B. entered a back bedroom of the apartment.[2]

¶ 11. T.B. testified that she was initially alone in the room and that she removed her pants to be more comfortable. She then lay down on a makeshift sleeping pallet atop one blanket and beneath another, and fell asleep. T.B. testified that she awoke when she sensed the presence of Carprue lying next to her. She said Carprue asked for a kiss and she obliged. He then asked if "he could have some." T.B. took this to mean sexual intercourse. She testified that she answered "no" and reminded him, as they had discussed in their telephone conversations, that her religious beliefs precluded her from having pre-marital sex. According to T.B., he responded "You not going to give me none?" and she again answered in the negative, to which he grinned and told her he was going to "take some" anyway. T.B. testified that at first she thought he was kidding, but soon knew he was serious when he pinned her down and raped her, overcoming her repeated verbal and physical attempts to stop him.

¶ 12. Carprue presented a starkly different picture of events. In his version, he briefly left T.B. alone in the back bedroom, and when he returned, he lay next to her on the makeshift bed. T.B. had not fallen asleep. He

---

[2] The testimony is again inconsistent as to details. Carprue testified that he asked T.B. if she wanted to go to the back bedroom to go to sleep, but T.B. stated that *she* asked Carprue's cousin whether she could lay down in his room. Carprue indicated that he went in with her, and only left briefly to talk with his aunt, while T.B. testified that she went in the bedroom alone and fell asleep and Carprue entered later.

testified that they talked for a while. Carprue denied asking T.B. for a kiss, and testified that she initiated kissing. He then recited in explicit detail alleged consensual sexual activities. He indicated that at some point their sexual intercourse became "rough," but nonetheless remained consensual.

¶ 13. In Carprue's version of events, he exited the bedroom, which had no door separating it from the kitchen, and met his aunt who was entering the kitchen from the living room. He and his aunt had a brief conversation regarding breakfast; then Carprue went back into the bedroom. T.B. showed Carprue her coat, which had blood on it. The coat had apparently been underneath them during sexual intercourse. T.B. became angry and they had an argument. According to Carprue, T.B. was upset because the two were not supposed to have "gone that far" and that she had violated the tenets of her religious beliefs. Carprue testified that he explained to her that she did not have to confess her transgressions and that no one would find out. Carprue testified that she calmed down and said she still wanted to accompany him to his mother's house later that morning. The two fell asleep. Around noon, they awoke and T.B. left.

¶ 14. For her part, T.B. recalls that Carprue abruptly ended the nonconsensual intercourse when he heard his aunt enter the kitchen. She testified that, when he left, she went to the bathroom to clean up the blood on her clothing, but eventually gave up and returned to the bedroom to gather her jacket and purse. However, Carprue would not let her leave because she was so upset, and she eventually appeased him by lying down with him, only to sneak out when he fell asleep.

¶ 15. After she left, T.B. testified that she returned to her sister's apartment. She did not call the

664

police. She talked with her sister about what happened, however, and her sister convinced her to seek medical treatment at the hospital. A nurse examined T.B. and later offered an expert opinion that the injuries she observed in T.B.'s vaginal area were consistent with forceful sexual contact and that the act of sexual intercourse was forced.

¶ 16. A nurse at the hospital called the police. Detective John Reesman of the Milwaukee Police Department testified that he arrived at Mt. Sinai Hospital where an initial investigation had begun. After being interviewed, T.B. led officers to Carprue's aunt's residence, where she pointed out Carprue, who happened to be sitting on the porch. By the time Detective Reesman parked his squad car and arrived at the front door, Carprue was no longer on the porch. The detective knocked on the door, and Carprue's aunt answered. The detective was permitted to enter the apartment and, once inside, saw Carprue in the kitchen at the rear of the apartment. When Carprue spotted Detective Reesman, who was accompanied by a uniformed police officer, he fled. He ran down a back stairwell that led to the building's basement. Carprue was eventually discovered hiding under the front porch, which he accessed through a window in the basement. When asked at trial why he fled, Carprue responded:

> Cause I was supposed to be at In-House at one house, I knew I was violating it back at my auntie's house.
>
> I was supposed to be expedited [sic] to Gary [Indiana] for charges down there, that was dropped while I was in custody with the Milwaukee Police Department.
>
> But I was informed also, that once I got out of custody, they may bring the warrant back up.

So it was like—I was both scared from violating being at another house while I was on In-House, and the real thing, my thinking they was trying to transfer me back to Gary.

¶ 17. Earlier in the proceeding, T.B. testified that Carprue told her that he would be released from the HOC to "house arrest." After a sidebar with counsel, Judge Schellinger paused to clarify what "house arrest" entailed. She explained to the jury that "house arrest" was electronic surveillance, in which the subject of the surveillance is required to wear a "bracelet" that connects to a phone device so that when a monitoring agent calls, the agent can be sure that the subject is present at the residence.

¶ 18. Later, with the jury absent, Carprue explained to the judge that he was not under electronic surveillance, as stated by the court. He was subject to an "in-house" monitoring system.

¶ 19. During Carprue's testimony the following day, when the "in-house" system again came up, Judge Schellinger called for a sidebar with counsel and then acknowledged to the jury that her earlier explanation was in error. She explained that "in-house" monitoring does not involve a "bracelet." Rather, it simply requires a subject to be at a specified location when a monitoring agent calls. Judge Schellinger described the pertinent characteristics of "in-house" monitoring and took judicial notice of these facts.

¶ 20. When Carprue finished testifying, the jury left the courtroom for lunch. After the jury was out, Judge Schellinger stated: "I want to make sure that the questions that were asked and answers that were given, conform to In-House [C]orrectional [S]ervices reports." Judge Schellinger then called Kenneth Morrow, the director of In-House Correctional Services to the stand.

Morrow was present because he was on Carprue's witness list in the capacity of "custodian of records" of Carprue's "in-house" file. The judge questioned him about "in-house" procedures.

¶ 21. First, Judge Schellinger inquired about documentation in Carprue's file relating to his two addresses. The file contained the aunt's address as well as T.B.'s sister's address, with the former having been "Xed out" in favor of the latter. Morrow testified that he did not know why the placement was changed. Morrow's testimony confirmed that law enforcement authorities had Carprue's aunt's address in Carprue's file, so that, had they been attempting to track Carprue down, they could have started with her address.

¶ 22. Second, Judge Schellinger inquired into the technological compatibility of the "in-house" monitoring program with certain optional phone company services such as call waiting. During his testimony, Carprue had alluded to the fact that he had difficulty setting up telephonic monitoring at his aunt's house because she had certain phone company services that were incompatible with the "in-house" program's telephone monitoring system. Carprue's explanation suggested that the "in-house" agents could not monitor him over the phone if certain phone services were present. Morrow testified that if there were any such incompatibility, someone from "In-House" would stop by in person to check on the subject.[3] At the same time, Morrow confirmed that In-House Correctional Services preferred that a phone line not have "call management, where a computer answers the phone instead of a person."

---

[3] Carprue's attorney also questioned Morrow. On cross, Morrow corroborated in some measure Carprue's recollection that he could not have certain features on his phone.

¶ 23. Finally, Judge Schellinger asked Morrow about the procedure employed when "In-House" personnel are unable to contact a subject of "in-house" monitoring, as well as what information subjects of monitoring would know about the consequences of a failure to make contact. Morrow's answers suggested that Carprue had been informed before being placed on "in-house" monitoring that, if he could not be contacted, the service would report his violation to the court that ordered the monitoring. The police would not be called. However, Morrow conceded that, in some cases, the police could be called if authorities had obtained a bench warrant.[4]

¶ 24. All this took place while the jury was absent from the courtroom. After Morrow stepped down, Judge Schellinger explained:

> The court really never gets involved in the examination of witnesses, particularly in front of a jury, but there have been things said by the defendant in this case which are inconsistent with the way In-House operates.
>
> That's why I have asked Mr. Morrow to come up here.
>
> I'm not commenting on whether or not the defendant has been untruthful or whatever, his understanding is different than that which is the case.

¶ 25. During the jury's absence, Judge Schellinger also questioned Carprue regarding a letter he had

---

[4] Morrow stated:

[T]he standard instruction we give every client, is if there is no contact, we explain it, if we do not have contact with that person in a twenty-four hour period, if [] we can't determine what happened to that person, we're going to notify the court.

The court issues a bench warrant and on occasion, knowing the bench warrant is issued, call the police myself to have person picked up, if I know where the person was.

written to a judge in a different case. In the letter, Carprue requested leniency, and referred to his fiancée. There were some inconsistencies between the letter and Carprue's testimony. The letter was in a file that Judge Schellinger may have used to explain to the jury why Carprue had been in the Milwaukee County HOC, but this is not clear. Several times Judge Schellinger instructed the jury that it was not to accord any significance to the fact that Carprue had been in the HOC and on "in-house" monitoring. In order to defuse any lingering suspicion about his status, Judge Schellinger explained that "Carprue was the subject of a criminal complaint being filed in a traffic matter on February 23rd, 2001." The court in the other case released Carprue on a signature bond and, as a condition of the bond, Carprue was to be placed on "in-house" monitoring.

¶ 26. When the jury returned to the courtroom, the State called Kenneth Morrow as a rebuttal witness. The State asked Morrow what the "in-house" program tells its subjects about consequences of violating the terms of release. Morrow responded in much the same manner as when the jury was not present. Carprue's counsel then cross-examined Morrow, getting him to admit that the subject of in-house monitoring is never expressly informed that the police would *not* be informed if the subject of monitoring could not be contacted.

¶ 27. The jury returned a guilty verdict on second-degree sexual assault.[5] Carprue appealed. *Carprue,* 266 Wis. 2d 168. He alleged that the circuit court

---

[5] In instructing the jury prior to its deliberations, Judge Schellinger conveyed the following instruction: "If any person has an impression about my opinion, whether the defendant is

committed reversible error by calling and questioning Morrow and by questioning Carprue regarding the letter he wrote to another judge. He also challenged his conviction on ineffective assistance of counsel grounds, based on his attorney's failure to object to the court's actions. *Id.,* ¶ 7. The court of appeals reversed Carprue's conviction, holding that Judge Schellinger's conduct demonstrated that the court was acting as a "hinting advocate" for the prosecution. *Id.,* ¶ 16. It held that Judge Schellinger's conduct "threatened the fairness of the trial," *id.,* ¶ 13, and exceeded the parameters of acceptability, resulting in "the appearance of advocacy and partisanship." *Id.,* ¶ 18. The court of appeals concluded that Judge Schellinger "could no longer maintain impartiality and objectivity." *Id.*

¶ 28. In dissent, Judge Fine reasoned that, because Carprue's attorney did not object, his claim of error should be handled as an ineffective assistance of counsel claim. *Id.,* ¶ 26. Under that analysis, Judge Fine concluded that Carprue could show no prejudice because the jury was not present when the conduct at issue took place. *Id.,* ¶ 27.

## DISCUSSION

¶ 29. From the outset, Carprue's appeal has focused on Judge Schellinger's calling and questioning of Kenneth Morrow and her questioning of Carprue about statements contained in his letter to another judge. The issues presented by the court's actions could be addressed under any of three legal theories:

> (1) Judge Schellinger erred by exceeding the implicit limitations of her authority to call and interrogate witnesses under Wis. Stat. § 906.14;

guilty or not guilty, disregard that impression entirely and decide the issues of fact as you view the evidence."

(2) Carprue was denied the effective assistance of counsel because his counsel did not object to Judge Schellinger's actions, thereby waiving a claim of error under § 906.14; or

(3) Judge Schellinger violated Carprue's due process rights to a fair trial before an impartial judge.

¶ 30. Carprue conflates two of these distinct legal theories by arguing that, when a judge exceeds her authority under § 906.14, such actions automatically constitute a structural defect that violates due process. Thus, Carprue advances only two theories. First, considering the judge's actions, Carprue was denied due process. Second, because his counsel did not object to the judge's actions, Carprue was denied the effective assistance of counsel. The court of appeals rendered a decision along this line, blending the principles of a § 906.14 error claim with a due process claim. The court disregarded "Carprue's second issue," ineffective assistance of counsel, on grounds that, having decided the case on due process grounds, there was no need to discuss ineffective assistance of counsel. *See id.,* ¶ 19 n.3. We will discuss all three modes of analysis, relating the relevant facts to the applicable law.

A. Judicial Authority to Call and Question Witnesses

¶ 31. Wisconsin Stat. § 906.14 is titled "Calling and interrogation of witnesses by judge." It reads:

(1) Calling By Judge. The judge may, on the judge's own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.

(2) Interrogation by Judge. The judge may interrogate witnesses, whether called by the judge or by a party.

671

(3) Objections. Objections to the calling of witnesses by the judge or to interrogation by the judge may be made at the time or at the next available opportunity when the jury is not present.

¶ 32. In substance, this rule is identical to Rule 614 of the Federal Rules of Evidence. Fed. R. Evid. 614. It is also based upon Wisconsin case law. Wisconsin Rules of Evidence, 59 Wis. 2d R, R200 (1973).

¶ 33. Under subsection (1), a judge may call witnesses on her own motion. There are no explicit limitations to this power, but limitations are implied by Wisconsin court decisions. The Judicial Council Committee's Note to subsection (1) reads in part: "It is expected that this authority will be used only in the exceptional case." *Id.*

¶ 34. Subsection (3) of § 906.14 authorizes objections, and it "defers the requirement of a timely objection . . . to the next available opportunity when the jury is not present." *Id.* R202. This subsection appears to focus more on situations where the judge questions witnesses in front of a jury than where a judge questions a witness in a bench trial or outside the presence of a jury.

██

¶ 35. Given the explicit authority to object to a judge's action, Carprue could have challenged Judge Schellinger's decision to call Kenneth Morrow to the stand. He did not. He could have objected to a particular line of inquiry. He did not. He could have offered a motion in limine to bar the State from calling Morrow as a rebuttal witness. He did not. Consequently, Carprue waived his right to object to the judge's actions.

¶ 36. There are several reasons why we are disinclined to overlook the defendant's failure to timely object. First, the general rule in Wisconsin is that issues not raised in the circuit court are deemed waived. *State v. Polashek,* 2002 WI 74, ¶ 25, 253 Wis. 2d 527, 646 N.W.2d 330; *Apex Elec. Corp. v. Gee,* 217 Wis. 2d 378, 384, 577 N.W.2d 23 (1998). This case is very different from *State v. Hayes,* 2004 WI 80, 273 Wis. 2d 1, 681 N.W.2d 203, where the defendant was able to point to a somewhat ambiguous statute to support the proposition that he did not have to object at trial to challenge the sufficiency of the state's evidence. In this case, the relevant statute, § 906.14, specifically addresses a party's right to object. Hence, as the court of appeals said in *State v. Wolter,* "[o]bjections to alleged judicial misconduct must be timely made. A failure to make a timely objection constitutes a waiver of objection." *Wolter,* 85 Wis. 2d 353, 373, 270 N.W.2d 230 (Ct. App. 1978).

¶ 37. Second, the policies underlying the waiver rule are especially well illustrated in this case. "The waiver rule exists to cultivate timely objections." *State v. Erickson,* 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999). Timely objections promote efficient judicial administration by encouraging parties and courts to correct or avoid errors at trial. *Id.* (citing *State v. Agnello,* 226 Wis. 2d 164, 173, 593 N.W.2d 427 (1999)); *see also Vollmer v. Luety,* 156 Wis. 2d 1, 11, 456 N.W.2d 797 (1990). They may eliminate the need for an appeal. In addition, the waiver rule diminishes any strategic incentive to induce error in order to gain access to appellate review. *Erickson,* 227 Wis. 2d at 766; *Vollmer,*

156 Wis. 2d at 11. Even where a timely objection fails to correct error, it creates a record that facilitates appellate review.

¶ 38. Here, the judge acted outside the presence of the jury. The defendant would not have been embarrassed in front of the jury by launching an immediate objection to either of the judicial actions about which he now complains. Upon receiving objection, the court might have terminated questions and avoided any questionable conduct.

¶ 39. Finally, because appellate courts are sensitive to judicial intervention by a trial judge in the form of judicial witnesses and judicial questioning, circuit courts are likely to be very cautious when they are given fair notice that their conduct raises concerns.

¶ 40. This court has dealt with these concerns since at least 1881. *Yanke v. State,* 51 Wis. 464, 466–67, 8 N.W. 276 (1881). We have always recognized judicial authority to call and interrogate witnesses but simultaneously admonished caution against judicial abuse. The tension is seen in the 1906 case of *Komp v. State,* where the court stated:

> The right of a trial judge, in the exercise of a sound discretion, to examine or cross-examine a witness cannot be doubted. It is a right that is sometimes most valuable in the administration of justice, but it should be most carefully exercised, and the questions put should not betray bias or prejudice, nor carry to the jury the impression that the judge has made up his mind as to the facts. The questions should be framed to make clear that which is not clear. Within these limits there can be no just fault found with the fact that the trial judge asks some questions of a witness.

129 Wis. 20, 24, 108 N.W. 46 (1906) (citations omitted).

¶ 41. The struggle for balance appears again in *State v. Nutley,* 24 Wis. 2d 527, 129 N.W.2d 155 (1964), *overruled on other grounds by State v. Stevens,* 26 Wis. 2d 451, 463, 132 N.W.2d 502 (1965). In *Nutley,* we addressed a claim that, when the trial judge cross-examined the defendants in front of the jury, he "created the image of guilt in the jurors' eyes." *Id.* at 561. We noted that the judge questioned each defendant in relation to internal inconsistencies between his version of events and the version offered by the codefendants. We concluded that the court's conduct was justified in order "to clarify a relevant and highly material line of inquiry." *Id.* at 562. In reaching this conclusion, we quoted Judge Learned Hand's insight that:

> It is permissible, though it is seldom very desirable, for a judge to call and examine a witness whom the parties do not wish to call. A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert.

*Id.* (quoting *United States v. Marzano,* 149 F.2d 923, 925 (2d Cir. 1945)). In the conflicted manner typical of decisions in this area, we reasoned: "While the court cannot function as a partisan, it may take necessary steps to aid in the discovery of truth." *Id.*

¶ 42. In *State v. Asfoor,* the tension between the competing interests was very apparent. 75 Wis. 2d 411, 435–37, 249 N.W.2d 529 (1977). In *Asfoor,* the defendant appealed on the ground that the judge presiding over his criminal trial was biased against him. *Id.* at 424. The defendant directed the court's attention to several instances on the record that suggested bias, including

what this court characterized as the judge's "somewhat active role in questioning witnesses." *Id.* at 437. The court stated:

> There is a fine line which divides a judge's proper interrogation of witnesses and interrogation which may appear to a jury as partisanship. A trial judge must be sensitive to this fine line. However, the trial judge is more than a mere referee. The judge does have a right to clarify questions and answers and make inquiries where obvious important evidentiary matters are ignored or inadequately covered on behalf of the defendant and the state. A judge does have some obligation to see to it that justice is done but must do so carefully and in an impartial manner. The questions asked here were appropriate and disclose no improper motive nor partiality.

*Id.* The court concluded that the jury was not improperly influenced by "any action" of the court, and therefore rejected the defendant's bias claim. *Id.*

¶ 43. Over the years, this court has demonstrated particular concern about the impression that judicial questions might convey to a jury. There has been reluctance "to hold that the trial court's involvement in the elicitation of testimony during a trial resulted in such prejudice as to require a new trial." *Schultz v. State,* 82 Wis. 2d 737, 742, 264 N.W.2d 245 (1978). But the court did order a new trial when the judge interrogated a witness about a conviction that was reversed on jurisdictional grounds, and, as a result, "[t]he jury may very well have gained the impression that the defendant was guilty nevertheless." *Benedict v. State,* 190 Wis. 266, 272, 208 N.W. 934 (1926). In its opinion, the court commented that the practice of judicial interro-

gation "is a dangerous one, and if the discretion of the [trial] court in the premises is abused a new trial will be granted." *Id.* at 273.

¶ 44. The opinions of our appellate courts are replete with precatory admonitions that trial judges must not function as partisans or advocates, *State v. Garner,* 54 Wis. 2d 100, 104, 194 N.W.2d 649 (1972), or betray bias or prejudice, *State v. Driscoll,* 263 Wis. 230, 238, 56 N.W.2d 788 (1953), or engage in excessive examination, *Breunig v. American Family Insurance Co.,* 45 Wis. 2d 536, 548, 173 N.W.2d 619 (1970), particularly in front of juries. Last term, we reversed a conviction after a suppression hearing in which a circuit judge crossed the line of propriety. *State v. Jiles,* 2003 WI 66, ¶ 39, 262 Wis. 2d 457, 663 N.W.2d 798 ("The court must not permit itself to become a witness or an advocate for one party. A defendant does not receive a full and fair evidentiary hearing when the role of the prosecutor is played by the judge and the assistant district attorney is reduced to a bystander.").

¶ 45. In the present case, if Carprue had objected, Judge Schellinger would likely have altered her conduct or taken the opportunity to more fully explain her actions. In addition, the prosecution would have had an opportunity to explain whether it had planned to call Morrow as a rebuttal witness before Judge Schellinger intervened. Since Carprue did not object, any error by the court went unchecked, and the record is devoid of any contemporaneous explanation that would have been present if an objection had been lodged.

██

¶ 46. We presume that circuit judges try to be fair and impartial in their conduct of trials, and this presumption must be overcome by proof except in extreme cases of structural error. A defendant's failure to

promptly raise concerns or object when he believes a judge is committing error constitutes waiver.

██

¶ 47. The absence of any objection warrants that we follow "the normal procedure in criminal cases," which "is to address waiver within the rubric of the ineffective assistance of counsel." *Erickson,* 227 Wis. 2d at 766 (citing *Kimmelman v. Morrison,* 477 U.S. 365, 374 (1986); *Lockhart v. Fretwell,* 506 U.S. 364, 380 n.6 (1993) (Stevens, J., dissenting); *State v. Smith,* 207 Wis. 2d 258, 273, 558 N.W.2d 379 (1997); *State v. Vinson,* 183 Wis. 2d 297, 306–07, 515 N.W.2d 314 (Ct. App. 1994)).

B. Ineffective Assistance of Counsel

██

¶ 48. Carprue asserts that, if his attorney waived objection to Judge Schellinger's conduct, he was denied the effective assistance of counsel and his conviction should be reversed. This court follows the two-part analysis for ineffective assistance of counsel claims established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687 (1984). *See State v. Pitsch,* 124 Wis. 2d 628, 633, 369 N.W.2d 711 (1985). Under this framework, Carprue must demonstrate "(1) that his counsel's representation was deficient and (2) that this deficiency prejudiced him so that there is a 'probability sufficient to undermine our confidence in the outcome' of the case." *Erickson,* 227 Wis. 2d at 768 (quoting *Strickland,* 466 U.S. at 694).

██

¶ 49. When this court reviews an ineffective assistance of counsel claim, its purpose "is not to grade counsel's performance." *Strickland,* 466 U.S. at 697. As a consequence, it is appropriate to assume for the sake

of argument that counsel's performance was deficient and determine whether the claim can be disposed of on prejudice grounds. *State v. Johnson,* 133 Wis. 2d 207, 222, 395 N.W.2d 176 (1986); *see also State v. Lindell,* 2001 WI 108, 245 Wis. 2d 689, 629 N.W.2d 223. " 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed.' " *Lindell,* 245 Wis. 2d 689, ¶ 128 (quoting *Strickland,* 466 U.S. at 697).

¶ 50. The jury empanelled for Carprue's trial was unaware of Judge Schellinger's conduct; all the potentially objectionable activity took place outside the presence of the jury. Further, with respect to the questions posed to Carprue himself, none of the information disclosed was ever presented to the jury and thus could not have prejudiced the trier of fact.

¶ 51. As to calling and questioning Kenneth Morrow, Carprue concedes that none of Morrow's testimony should have been excluded on grounds of some evidentiary defect. As we understand Carprue's position, Morrow's otherwise relevant testimony was tainted because the jury would not have heard it but for Judge Schellinger's intervention. Thus, in order for there to be a colorable basis to find prejudice, we must not only assume that trial counsel could have and should have objected at the time, but that the prosecution did not intend to present rebuttal evidence regarding the procedures of "in-house" monitoring.

¶ 52. Carprue's argument substantially departs from the record in the case. During the State's cross-examination of Carprue, the State asked: "Since when did you ever hear of the Milwaukee Police Department enforcing [i]n-[h]ouse?" Defense counsel immediately objected, saying: "I'm going to object. *That calls for facts not in evidence.*" (Emphasis added.) These passages

indicate that the prosecutor was well aware of the significance of in-house procedures *before* Judge Schellinger intervened.

¶ 53. Even if we assume that the prosecution would not have attempted to establish evidence about "In-House" monitoring's actual procedures, we still cannot conclude that Carprue experienced prejudice from his trial counsel's failure to object. The jury could have believed both Morrow and Carprue—Morrow's testimony did not directly contradict Carprue's testimony. It is entirely possible that Carprue truly believed that, if the "In-House" monitoring agents were unable to contact him, the police would be called. Carprue's attorney successfully elicited testimony that subjects of supervision were *not* told directly that the police would not be called.

¶ 54. Carprue does not contend that all evidence of his flight from the police should have been suppressed. The issue of flight was collateral to the primary issue in the case, namely, whether Carprue sexually assaulted T.B. If the jury had fully accepted Carprue's explanation of his flight, it would have understood that he knew he had violated the conditions of his release from the HOC and was also potentially subject to criminal charges in Gary, Indiana. His own version of events—*before* Judge Schellinger ever questioned Morrow—damaged Carprue's credibility even more than the three prior convictions to which he admitted on direct examination.

¶ 55. The prosecution presented ample evidence to substantiate T.B.'s claim of sexual assault, including bloodstained clothing and the testimony of an expert witness who concluded that T.B.'s vaginal injuries were consistent with forceful sexual contact. We have attempted to present a broad overview of Carprue's trial

to provide perspective. Even if the prosecution would not have presented Morrow's rebuttal testimony, the addition of that testimony did not distort the evidence or undermine our confidence in the outcome of the trial.

¶ 56. Carprue asserts that prejudice should be presumed in this case. He argues that "when errors occur the nature of which implies that the proceedings appear to be fundamentally unfair, it is necessary to deem them per se prejudicial." While there are no doubt rare circumstances where prejudice is presumed, *see Smith,* 207 Wis. 2d at 278; *Erickson,* 227 Wis. 2d at 770, the failure to object to a judge's possible violation of the authority to call and interrogate witnesses does not necessarily result in the "actual or constructive denial of the assistance of counsel altogether," a situation in which *Strickland* instructs that prejudice is to be presumed. *Strickland,* 466 U.S. at 692.

¶ 57. Carprue's claim that the proceedings were fundamentally unfair stems from his allegation of a biased judge, not the effectiveness of his counsel. If there were structural error in the trial, as addressed in the next section, such error could not be waived and there was therefore no need for an ineffective assistance of counsel claim.

C. Judicial Bias

¶ 58. Carprue contends that he was denied his due process right to a fair trial because Judge Schellinger was not impartial. His evidence consists of the judge's actions in calling and questioning Morrow and in questioning Carprue.

¶ 59. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136 (1955); *see also State v. Kywanda F.,* 200 Wis.

2d 26, 35, 546 N.W.2d 440 (1996); *State v. Walberg,* 109 Wis. 2d 96, 105, 325 N.W.2d 687 (1982); *Asfoor,* 75 Wis. 2d at 436; *State ex rel. Mitchell v. Bowman,* 54 Wis. 2d 5, 7, 194 N.W.2d 297 (1972). Case law makes clear that when a judge presides in a case where the judge has a direct, personal, substantial pecuniary interest in the outcome of the proceeding, *Tumey v. Ohio,* 273 U.S. 510, 523 (1927), this constitutes "structural error" and would be subject to automatic reversal. *State v. Harvey,* 2002 WI 93, ¶ 37, 254 Wis. 2d 442, 647 N.W.2d 189.

¶ 60. If Judge Schellinger were actually biased, the question would be whether she should have presided at all. In this case, Carprue can do no more than allege that Judge Schellinger harbored general bias in favor of the State in criminal prosecutions based upon her actions. He presents no basis to conclude that Judge Schellinger had any direct stake in the outcome of the proceeding. "[O]nly in the most extreme cases would disqualification based on *general* allegations of prejudice or bias be constitutionally required." *Kywanda F.,* 200 Wis. 2d at 36 (emphasis added) (citing *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 821 (1986)); *see also State v. Harrell,* 199 Wis. 2d 654, 673, 546 N.W.2d 115 (1996) (Bradley, J., concurring). Otherwise, "most matters relating to judicial disqualification [do] not rise to a constitutional level." *FTC v. Cement Institute,* 333 U.S. 683, 702 (1948), *quoted in Lavoie,* 475 U.S. at 820. Instead, "matters of kinship, personal bias, state policy, [and] remoteness of interest would seem generally matters of legislative discretion." *Tumey,* 273 U.S. at 523; *see also Kywanda F.,* 200 Wis. 2d at 36.

¶ 61. Our legislature, in keeping with this principle, has established seven statutory situations that

require judicial disqualification. Wis. Stat. § 757.19(2).[6] The only statutory ground requiring disqualification that might apply under these facts is one that requires disqualification if a judge determines that he or she cannot, or it appears he or she cannot, act impartially in a case. Wis. Stat. § 757.19(2)(g). We concluded in *State v. American TV & Appliance,* 151 Wis. 2d 175, 182–83, 443 N.W.2d 662 (1989), that a judge's disqualification decision under this paragraph is subjective, that is, it is up to the judge's own determination. This provision "leaves the responsibility of withdrawal to the integrity of the individual judge." *Harrell,* 199 Wis. 2d at 665. If

---

[6] Wisconsin Stat. § 757.19(2) reads as follows:

(2) Any judge shall disqualify himself or herself from any civil or criminal action or proceeding when one of the following situations occurs:

(a) When a judge is related to any party or counsel thereto or their spouses within the 3rd degree of kinship.

(b) When a judge is a party or a material witness, except that a judge need not disqualify himself or herself if the judge determines that any pleading purporting to make him or her a party is false, sham or frivolous.

(c) When a judge previously acted as counsel to any party in the same action or proceeding.

(d) When a judge prepared as counsel any legal instrument or paper whose validity or construction is at issue.

(e) When a judge of an appellate court previously handled the action or proceeding while judge of an inferior court.

(f) When a judge has a significant financial or personal interest in the outcome of the matter. Such interest does not occur solely by the judge being a member of a political or taxing body that is a party.

(g) When a judge determines that, for any reason, he or she cannot, or it appears he or she cannot, act in an impartial manner.

Judge Schellinger determined that she could not act impartially, she was required to disqualify herself.

¶ 62. "The reviewing court must objectively decide if the judge went through the required exercise of making a subjective determination." *Id.* at 664. By instructing the jury that it was to disregard any impression that it might have regarding whether she believed the defendant was guilty or not guilty, we can infer that Judge Schellinger did consider the matter of bias. *See supra* note 5. In any event, because Carprue's claim rests upon an allegation of general bias, the record would not have contained a more thorough record of Judge Schellinger's subjective thought process unless the defendant had objected. In the absence of any objection, we assume that, by presiding, Judge Schellinger believed that she could act in an impartial manner.

¶ 63. Carprue bases his claim on the broader argument that Judge Schellinger was anti-defendant. As we noted above, for judicial disqualification based on general allegations of bias to be constitutionally required, Carprue must demonstrate that Judge Schellinger's conduct represented the "extreme" case. The record does not warrant such a finding.

¶ 64. In support of his contention that Judge Schellinger was partial, Carprue directs our attention to the same two incidents discussed above and characterizes Judge Schellinger's motivation for her actions as animated by partiality and bias. As to the questioning of Morrow, Carprue asserts that Judge Schellinger's purpose was to assist the prosecution by providing a blueprint to discredit Carprue's testimony. Carprue also asserts that Judge Schellinger's questions to him re-

quired Judge Schellinger to go out of her way to obtain Carprue's file, canvass the file in search of negative information, and then question him about it in open court. However, both of these incidents have more benign explanations.

¶ 65. As to calling and questioning Morrow, the record reflects several points of confusion with respect to "in-house" monitoring. The majority of Judge Schellinger's questions to Morrow were directed at clarifying this confusion. While we discourage judicial intervention in this manner if it can be avoided, the fact that Judge Schellinger had taken judicial notice of "In-House" Correctional Services' practices warranted that she assure herself that the information the jury was instructed to accept as fact was accurate. *See* Wis. Stat. § 902.01(7). Moreover, Judge Schellinger dispelled any uncertainty about her motivation by explaining that she did not intend to imply that Carprue was being untruthful. Instead, she made clear that she was attempting to ascertain what "In-House" Correctional Services' procedures were, wholly apart from what Carprue believed them to be.

¶ 66. With respect to the file Judge Schellinger obtained, the file was more likely in her possession because she wanted to mitigate any impression the jury might have by virtue of the evidence as to how Carprue and T.B. met, than because she was on a mission to impeach Carprue. As previously stated, Carprue was in the Milwaukee County HOC and then on "in-house" monitoring. Several times Judge Schellinger explained that the jury was not to read anything into those facts. She also explained that Carprue's confinement at the HOC was the result of a traffic offense, to allay suspicion of his involvement in more substantial criminal conduct. While we do not condone the extensive ques-

tioning of Carprue about the letter to another judge, we cannot conclude that this action is so "extreme" as to deprive Carprue of due process.

¶ 67. Were we to overreact to this situation in the absence of any discernible harm to Carprue, we would establish a precedent that would undermine the court's ability to take any action that a defendant might view as helpful to the state, *see Grover v. State,* 61 Wis. 2d 282, 283, 212 N.W.2d 117 (1973) (allowing the state to introduce additional testimony after it rested), or adverse to the defendant, *State v. Grinder,* 190 Wis. 2d 541, 527 N.W.2d 326 (1995) (shackling the defendant during trial). Such a decision would seriously compromise the court's historic right to call and question witnesses. We cannot embrace Carprue's position that "No court should be allowed to call and question a witness prior to completion of the presentation of evidence."

¶ 68. Although we reverse the decision of the court of appeals, we stand with the court of appeals in calling upon our circuit courts to foster an atmosphere of perfect impartiality and to strive for absolute objectivity in carrying out judicial functions. *Carprue,* 266 Wis. 2d 168, ¶ 12 (citing *Glasser v. United States,* 315 U.S. 60, 82 (1942), *superseded on other grounds by* Fed. R. Evid. 104(a)).

## CONCLUSION

¶ 69. Because there was no objection to Judge Schellinger's calling and questioning of Kenneth Morrow or questioning of the defendant, Carprue waived any claim of error in this regard. As a result, the facts of this appeal should be addressed under the rubric of ineffective assistance of counsel. Because Carprue can-

not demonstrate prejudice, his claim fails. In addition, Judge Schellinger's conduct, while unusual and not recommended, did not deprive Carprue of his right to a fair trial. Therefore, there was no structural error in the trial and the court of appeals was incorrect in reversing Carprue's conviction for second-degree sexual assault. We reverse the decision of the court of appeals and reinstate the defendant's conviction.

*By the Court.*—The decision of the court of appeals is reversed.

All work on this opinion was completed on or before June 30, 2004. Justice Diane S. Sykes resigned on July 4, 2004.