# COURT OF APPEALS
# DECISION
# DATED AND FILED

## June 27, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP424**

Cir. Ct. No. **2022TP7**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

IN RE THE TERMINATION OF PARENTAL RIGHTS TO E. A., A PERSON UNDER THE AGE OF **18**:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

J. L. A.,

      RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: JOSEPH R. WALL, Judge. *Affirmed.*

¶1 WHITE, J.[1] Julia appeals the order terminating her parental rights to her daughter, Emma.[2] Julia argues that her parental rights were not treated separately from the parental rights of her husband, Joseph. She contends that the evidence presented at the dispositional hearing did not warrant the termination of her parental rights. Upon review, we conclude that the circuit court properly exercised its discretion when it terminated Julia's parental rights. Accordingly, we affirm.

## BACKGROUND

¶2 Julia and her husband, Joseph, are the parents of Emma, born in December 2020. Emma was detained by the Division of Milwaukee Child Protective Services (DMCPS) after her release from the Neonatal Intensive Care Unit (NICU) in January 2021, where she had been treated for withdrawal symptoms for opiates present at birth. Emma has remained in out-of-home care throughout the pendency of this case.

¶3 The State filed the underlying petition for the termination of parental rights (TPR) in January 2022. It alleged two grounds: (1) that Emma continued to be a child in need of protection or services (CHIPS), pursuant to WIS. STAT. § 48.415(2); and (2) that Julia and Joseph each failed to assume parental responsibility for Emma, pursuant to § 48.415(6). In June 2022, Julia and Joseph each pled no contest to the ground of failure to assume parental responsibility in

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] For ease of reading and in the interest of confidentiality, we employ pseudonyms for the parents and child at issue in this case. *See* WIS. STAT. RULES 809.19, 809.86

the TPR petition. Upon Julia's motion, the court ordered partially unsupervised, expanded visitation for Julia with Emma, with a restriction that Joseph could not be present during unsupervised visitation.

¶4     In October 2022, the TPR case proceeded to hearings over three days. First, the State proffered evidence to prove the ground of failure to assume parental responsibility to which both parents pled no contest. The family case manager testified that she had previously worked with Julia and Joseph during DMCPS actions involving their older children. She stated that Joseph told her that he had not used any drugs since about 2014; however, Joseph failed to provide the case manager with any documentation to support this claim. The case manager testified that Julia reported being in methadone treatment for drug addiction, but that she had used heroin during her pregnancy with Emma. The case manager testified that Emma had been in out-of-home care her entire life, but that Julia had consistent visitation with her and had attended most medical appointments. The case manager explained that the safety concern for Julia was her "lack of understanding of the safety concerns that are caused by [Joseph's] ongoing [alcohol and other drug use (AODA)]." Upon reviewing that evidence, the court concluded that the ground existed and found Julia and Joseph to each be an unfit parent.

¶5     The court then moved to the dispositional phase of the TPR. The State called Emma's foster mother, who testified about the willingness she and her partner have to adopt Emma. The foster mother testified about Emma's health including withdrawal from opiates, GI and pulmonary issues, occupational therapy for sensory overload, and play therapy. She testified about the extensive, recurring, medical care Emma has needed for respiratory issues, including nebulizer and steroid treatment, as well as chest physiotherapy. She testified about

Emma's contact with Julia and Joseph, Emma's contact with her four older siblings, which included the parents' youngest biological son who was not in contact with their parents after the TPR order in his case and his adoption.

¶6 The State then called the family case manager. She testified that she had been involved with the family since 2015, when there were allegations of sexual abuse and neglect of their four children, well before Emma was born. The family case manager testified that when she began working with the family again in 2021—when Emma was detained—the parents had recently obtained housing after a long period of housing instability. She testified that Julia admitted to a heroin addiction and sought treatment while pregnant with Emma. Although Julia denied that there were domestic violence or controlling behaviors by Joseph, the case manager had concerns about both issues. The family case manager testified that Julia had maintained sobriety throughout this case.

¶7 The case manager testified that while Julia complied with, and had clean random urine analysis (UA) screens, Joseph did not comply with the UA testing. She testified that Joseph had a relapse in the summer of 2021; he tested positive for cocaine, opiates, and fentanyl when he sought AODA treatment. Joseph then failed to maintain contact with the case manager from December 2021 to June 2022. In July 2022—when Julia was granted individual partially unsupervised visitation—Joseph refused residential AODA treatment, detox, or day-treatment. The family case manager testified that there were safety concerns because Joseph had long standing drug addiction issues and he was not participating in the higher level of care recommended by his treatment providers.

¶8 The family case manager testified that she had discussed with both Julia and Joseph that they were assessed together as a pair because they lived

together and intended to stay together. She stated that from the beginning of the case, she explained that "progress that one parent has made or lack of progress that the other parent has made would have an influence on each other." The case manager testified that Julia had participated in individual therapy for about four months, "but communicated that she struggled to identify areas that she really needed to work on in therapy." After a referral, Julia and Joseph participated in couples counseling, and the therapist reported that they "struggled to identify any areas of need in their relationship." The case manager testified that Emma had a positive relationship with both Julia and Joseph and enjoyed her visits with them. Emma also had a positive relationship with her three oldest siblings, now teenagers or adults.

¶9 The case manager testified that she was concerned because both parents continued to deny that any physical or sexual abuse had occurred with the older children, despite Joseph's conviction and prison time for fourth degree sexual assault of their older daughter. The case manager expressed concerns about whether either parent could keep up with Emma's medical needs because they have not administered nebulizer breathing treatments during visitation. Further, both parents smoke. She was also concerned because the younger teenage son had not been enrolled in school, the oldest son had a criminal case history, and the older daughter had a substance abuse problem prior to her death from a medical condition.

¶10 During cross-examination, the family case manager testified that Julia was in compliance with several conditions of return in the CHIPS action: drug and alcohol treatment, required therapies, financial responsibility, and putting parenting practices in place. She further stated that Julia, if she were alone or not residing or in a relationship with Joseph, could provide a stable home for Emma.

5

However, in the State's redirect examination, the case manager testified that Julia was not in compliance with the condition of return that required her to "stay away from people, places, and things that trigger your use of drugs or alcohol" or to "avoid friends and family who use drugs and alcohol." She also testified that Julia did not show that Emma's "health and safety" was her "top priority" as demonstrated by Julia continuing to be in a relationship with Joseph.

¶11 During closing arguments, the State acknowledged that although Julia had made "significant progress," the prosecutor did not believe it was in Emma's best interest that Julia be the legal parent. The prosecutor stated that "if it was just [Julia], we probably would be at reunification already…. Unfortunately, I don't think we're anywhere close to reunification as long as they stay as a united pair." The State argued that reunification for Julia alone was not an option, and argued that Julia does not speak up when Joseph minimizes his drug abuse, his abuse history, and his willingness to get help.

¶12 The guardian ad litem (GAL) argued in her closing argument that while Julia had done a "remarkable job of maintaining sobriety … it's going to be a long struggle for her to maintain [sobriety], especially when she's with someone who is not doing that. She does not recognize the depth of [Joseph's] problems." Further, the GAL argued that Julia and Joseph did not work on problem solving in couples counseling for the "situation where [Joseph's] behavior was endangering [Julia's] relationship with her daughter."

¶13 Julia's counsel argued in closing that as "the mother of this child … [Julia] has certain due process rights, separate and apart from her husband, and she has a liberty interest to parent her child as an individual," and asked the court to "take that into consideration." The circuit court responded to Julia's counsel,

stating that she made a good point about Julia's individual due process right, but questioned how that impacted the best interests of the child. Julia's counsel noted that "[m]arriage is also something that's a protected liberty interest." The State offered in rebuttal that while the parents had "their individual liberties and their individual rights, [Julia] is not planning on acting as a parent by herself. She is planning on raising this child with her husband in a shared home." The State asserted that the court should "look at them as a package deal if [it] is her plan" to stay with Joseph.

¶14 On the final dispositional hearing date, the court first explained that "we are at the best interests stage, but parents' due process rights still loom over the proceedings and must be remembered. And part of [Julia's counsel's] argument, too, was that the [c]ourt needed to consider [Julia's] rights somewhat separately from [Joseph's] rights." The court reviewed the facts of the case and the evidence presented during the hearing. It noted that "[Julia] does not understand the safety concern about [Joseph's] use of drugs."

¶15 The court considered the six statutory factors in WIS. STAT. § 48.426(3)[3] on the record, as required. First, the court found that Emma was a

---

[3] In determining the disposition of a TPR petition, the circuit court must consider, but is not limited to, the following six factors:

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> (d) The wishes of the child.

(continued)

"very adoptable child" and that the foster parents were committed to adopting her. Second, the court considered that Emma was now about two years old and her health was "very much improved" since the time of her removal, when she was a newborn going through opiate withdrawal. Emma had "lingering health needs" including a "nebulizer[.]" The court found that "the evidence is overwhelming that her health has become much, much better outside of the [parents'] care and custody."

¶16 Third, the court concluded that Emma has a relationship with her biological parents, but that it is not substantial. On the question of whether it would be harmless to legally sever the relationship, the court noted that contact after the TPR was unenforceable because open adoption was not enacted in Wisconsin, therefore, even with the court assuming that the contact between Emma and her biological parents would stop, the court found that this factor still weighed in favor of termination.

¶17 Fourth, the court found that Emma, at age two, was too young to express her wishes, and that this factor did not weigh against termination. Fifth, the court considered that the duration of separation could be considered, objectively or subjectively, to be Emma's entire life. She has never lived with her biological parents.

---

(e) The duration of the separation of the parent from the child.

(f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

WIS. STAT. § 48.426(3).

¶18    Finally, the court considered the sixth factor to weigh very heavily in the analysis.  The court considered the condition of the foster placement to be excellent.  It considered that the foster parents expressed willingness to maintain contact and visitation with Emma's biological parents. It concluded Emma would be able to enter into a more stable and permanent family relationship, most likely with her current foster parents, if there was a termination.  If the TPR were not granted, it was likely that Emma would remain in foster care.  The court concluded that it was unlikely that Emma would ever be returned to her biological parents' care in the short term "because of [Joseph's] AODA problems, his stubbornness regarding that."  Looking at long term, the court considered it uncertain if Julia could maintain her sobriety.  The court considered uncertainty to not be in the best interest of the child when balancing stability and potential instability.

¶19    The court concluded that the TPR was in the best interests of the child.  It granted the State's petitions and terminated parental rights over Emma as to both Julia and Joseph.[4]

¶20    Julia appeals.

## DISCUSSION

¶21    Julia argues that the circuit court erroneously exercised its discretion when it granted the State's TPR petition.  She contends that the evidence does not support the termination of her parental rights.  She asserts that the court erroneously intertwined her parental rights with her husband's rights and denied her individual right to due process.  We conclude that the circuit court's decision

---

[4]  Joseph's case is not on appeal before this court.

to terminate Julia's parental rights was within its discretion. The court properly considered the best interests of Emma. While the court recognized the importance of Julia's individual rights, it did not ignore the safety risks posed by Joseph's drug abuse and Julia's failure to respond to those risks.

¶22 The decision to terminate parental rights is within the discretion of the circuit court. *See* ***Gerald O. v. Susan R.,*** 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996). We will sustain a circuit court's discretionary decision unless the court erroneously exercised its discretion. WIS. STAT. § 805.17(2). A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach. ***Dane Cnty. DHS v. Mable K.***, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198.

¶23 We begin with Julie's contention that the evidence presented by the State did not warrant the termination of her parental rights. She cites WIS. STAT. § 48.427(2), which provides that "[t]he court may dismiss the petition if it finds that the evidence does not warrant the termination of parental rights." This essentially is a sufficiency of the evidence argument. "Our standard of review in a challenge to the sufficiency of the evidence is whether there is any credible evidence to sustain the verdict." ***St. Croix Cnty. DHHS v. Michael D.***, 2016 WI 35, ¶29, 368 Wis. 2d 170, 880 N.W.2d 107. We review the evidence in the light most favorable to the verdict. ***Tammy W-G. v. Jacob T.***, 2011 WI 30, ¶39, 333 Wis. 2d 273, 797 N.W.2d 854. Whether the evidence was sufficient is a question of a law we review independently. ***Id.***, ¶17. In a trial to the court, its findings of fact shall not be set aside unless clearly erroneous. WIS. STAT. § 805.17(2).

¶24 Here, Julia points to the testimony from the family case manager that she had complied the conditions of return in the dispositional order in the underlying CHIPS case: she completed drug and alcohol treatment, she participated in required therapies, she showed financial responsibility, and she put parenting practices in place. She further relied on the case manager's testimony that if Julie were parenting alone or not with Joseph, she could provide a stable home for Emma. Nevertheless, as the State elicited in the redirect examination of the case manager, Julia was not in compliance with the condition of return that required her to "stay away from people, places, and things that trigger your use of drugs or alcohol" or to "avoid friends and family who use drugs and alcohol."

¶25 The record reflects that the case manager's major concern with Julia's parenting was that she did not understand the risks posed by Joseph's drug abuse, and that consequently, she did not protect Emma from potential harm. However, the case manager also raised concerns about Julia's parenting, including her failure to participate in Emma's therapies or to administer necessary medication, exposing Emma to cigarette smoke at visits, lack of acknowledgement of the risks smoking posed to Emma's respiratory conditions, and safety concerns resulting from Julia not being transparent about the history of abuse that has happened in her home. Accordingly, we conclude that there was sufficient, credible evidence presented to the court to support the court's decision to terminate Julia's parental rights. *See Michael D.*, 368 Wis. 2d 170, ¶29.

¶26 Looking to the court's remarks, it considered several factors to weigh in favor of termination. When the court considered the second factor about Emma's health, it found that Emma's health was "very much improved" since the time of her removal and that "the evidence is overwhelming that her health has become much, much better outside of the [parents'] care and custody." For the

third factor, the court concluded that there was not a substantial relationship between Emma and Julia—it was friendly and Emma knew and liked her parents, but she had never lived with them. The court concluded that the sixth factor weighed heavily in its analysis because stability was important. In that factor, the court found that it was unlikely that Emma would ever be returned to her biological parents' care in the short term "because of [Joseph's] AODA problems[.]" Further, the court considered it uncertain if Julia could maintain her sobriety long-term. Upon our examination of the record, this court concludes that there was sufficient evidence to support the circuit court's decision.

¶27 Alternatively, Julia frames her argument to assert that the circuit court put too much weight into the sixth factor—in her words, that Emma could not be returned home because of Joseph's failures. Framed this way, Julia's argument still fails. The weight that the court assigns to each factor is within the discretion of the circuit court, so long as the court "reflect[s] adequate consideration of and weight to each factor" on the record. *State v. Margaret H.*, 2000 WI 42, ¶35, 234 Wis. 2d 606, 610 N.W.2d 475. Here, the court considered each factor of WIS. STAT. § 48.426(3), on the record, and gave adequate consideration to each factor. It is not problematic that the court considered the sixth factor to be important and weigh heavily in the analysis. In fact, the record reflects that the court considered the relevant facts under the proper standard of law and demonstrated reasonable decision-making in its analysis. *See Mable K.*, 346 Wis. 2d 396, ¶39.

¶28 Julia's second major argument is that her individual due process rights were violated because no matter the progress made, she could still be denied the right to parent Emma due to her husband's failures. She contends that the circuit court's impermissibly intertwined the consideration of her parental rights

12

and Joseph's parental rights. She asserts that a TPR is not a collective action. The statutes reflect that a TPR is an action against an individual parent. "If … the grounds specified in § 48.415 are found to exist as to only one parent, the rights of only that parent may be terminated without affecting the rights of the other parent." WIS. STAT. § 48.43(3). Further, the dispositions of a TPR petition include that "[t]he court may enter an order terminating the parental rights of one or both parents." WIS. STAT. § 48.427(3). As the United States Supreme Court held, "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). As examined below, we reject this argument because the record reflects that circuit court did consider each parent individually.

¶29 Our examination of the record shows that Julia's rights were terminated not because of her husband's failures, but because of her own failures to meet the conditions of return to be able to protect Emma from the potential harm posed by Joseph on a full time basis. The court, the State, and the child welfare system did not require Julia to leave her husband, or to give up her fundamental right of marriage, in order to obtain placement of her child. Although Julia points to testimony by the case manager that if she parented alone, she might have been reunified with Emma, the court is not simply assessing whether she satisfied the conditions of return. In the dispositional phase, the court is mandated to consider the best interests of the child as its central determination. *Sheboygan Cnty. v. Julie A.B.*, 2002 WI 95, ¶30, 255 Wis. 2d 170, 648 N.W.2d 402.

¶30 In support of her position, Julia contends that the circuit court erred because it did not consider WIS JI—CHILDREN 302, which instructs the jury, in

13

part, that it "must consider the evidence against each parent separately and consider the evidence as to each ground separately. Each parent is entitled to separate consideration." We reject this argument primarily because the jury instruction goes to the grounds phase of the TPR proceedings, to which Julia pled no contest and waived her right to have a jury determine the issue. *See* WIS. STAT. § 48.424. The dispositional phase is a trial to the court. *See* WIS. STAT. § 48.427. Without a jury, or even a role for the court as a trier of fact, no jury instructions would be applicable. Further, this court presumes that the circuit court follows law in an impartial fashion. *See **State v. Carprue***, 2004 WI 111, ¶46, 274 Wis. 2d 656, 683 N.W.2d 31. As discussed above, our examination of the record reflects that the circuit court did consider each parent's individual parental rights in making its considerations over whether the TPR was in Emma's best interests.

## CONCLUSION

¶31 For the reasons stated above, we conclude that the circuit court properly exercised its discretion when it ordered the termination of Julia's parental rights to Emma.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

14