COURT OF APPEALS
DECISION
DATED AND FILED

January 4, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1583-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF5704

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

ROBERT MAURICE BLACK, JR.,

      DEFENDANT-APPELLANT.

---

      APPEAL from a judgment and an order of the circuit court for Milwaukee County: JOSEPH R. WALL and GLENN H. YAMAHIRO, Judges. *Affirmed*.

      Before Donald, P.J., Dugan and White, JJ.

      **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

      ¶1    PER CURIAM. Robert Maurice Black, Jr. appeals a judgment of conviction for first-degree reckless homicide as a party to a crime, entered upon a

jury's verdict. He further appeals the order denying his motion for postconviction relief. Black makes two primary arguments on appeal. First, he contends the evidence was insufficient to support his conviction. Second, he asserts that he received ineffective assistance of counsel in three ways: (1) his counsel failed to move to suppress his second statement to police, a statement made after he invoked his right to counsel; (2) his counsel failed to secure the attendance of two witnesses; and (3) his counsel provided ineffective representation at sentencing. We reject all of Black's arguments, and accordingly, we affirm.

## BACKGROUND

¶2      This case arises out of the shooting death of R. Riggins on December 4, 2017. According to the criminal complaint, Milwaukee Police Department (MPD) officers were dispatched to West Mineral Street in Milwaukee for reports of a shooting; Riggins was found in the rear yard of a property near his residence with apparent gunshot wounds. After canvassing the area, MPD retrieved video surveillance footage that captured the front and rear of Riggins's residence. Through their investigation of Riggins's phone records, they arrested and interviewed Black on December 7, 2017. Black was charged with first-degree reckless homicide as a party to a crime.

¶3     The case proceeded, with Black ultimately being represented by at least four attorneys by the time of trial in February 2019.[1]  Relevant to this appeal, after filing a motion to withdraw, Black's third attorney filed a notice of an alibi on August 15, 2018, claiming Black was at another address in Milwaukee with a person named L.P. at the time of the shooting.  Black also filed several *pro se* motions while represented, including a speedy trial demand; ultimately, the trial court[2] discussed Black's concerns on the record in January 2019, but stated that the court could not consider *pro se* motions from represented defendants.[3]  On January 3, 2019, the trial court granted a continuance on the speedy trial because, although Black objected, his trial counsel informed the court he needed additional time to adequately prepare Black's defense.

¶4     After an additional delay caused by the courthouse closing due to extreme weather, the trial began February 4, 2019.  We now recite the facts that support the foundation of the State's evidence.  The State presented testimony from MPD officers, detectives, and analysts establishing a timeline for the events

---

[1] In March 2018, Black's appointed counsel from the State Public Defender's (SPD) Office moved to withdraw, at Black's request, citing that Black lacked confidence in the first attorney.  SPD appointed a second attorney as Black's counsel in April 2018, but that attorney was then replaced by a third attorney as Black's counsel (the reason for this change is not clear from the record).  Black's third attorney moved to withdraw on August 13, 2018, at Black's request, citing Black's complaint that counsel had not prepared a defense and then Black refused to discuss the case with his attorney.  On August 31, 2018, the trial court granted the third attorney's motion to withdraw, and agreed that counsel would be appointed again.  Black's fourth attorney was appointed in September 2018.

[2] The Honorable Joseph R. Wall heard Black's case through trial and sentencing.  We refer to Judge Wall as the trial court.  The Honorable Glenn H. Yamahiro denied Black's postconviction motion.  We refer to Judge Yamahiro as the circuit court.

[3] Black filed *pro se* motions to dismiss in August 2018 and December 2018 and a *pro se* motion for a speedy trial in October 2018.  Black agreed to waive the speedy trial issue when the trial date was set five days beyond the ninety-day speedy trial deadline.

and contact between Black and Riggins on December 3 and 4, 2017. The State established the retrieval and analysis of two sets of video surveillance footage: (1) from a pool hall where Black and Riggins went together on December 3, 2017, and (2) from the front and rear of the premises on West Mineral Street, where the State presented testimony that Riggins lived and was found with fatal gunshot wounds on December 4, 2017. The State also established through police testimony: (1) Black's connection to Riggins through Riggins's phone records, (2) Black's arrest on December 7, 2017, (3) the first custodial interrogation on December 8, 2017, (4) the arrest of T.F., who accompanied Black and Riggins to the pool hall, and the impound of Black's dark-colored Jeep SUV, (5) the search of Black's cell phone secured with his permission, (6) the analysis of Black's and Riggins's cell phone records, and (7) the attainment and analysis of Black's cell carrier records, including mapping his cell site location information. Further, the State established through the Milwaukee County Medical examiner that Riggins's had sustained eight gunshot wounds, and that multiple gunshot wounds caused his death.

¶5    On the second day of the jury trial, the State played clips from the video surveillance footage at the pool hall. The detective who retrieved the footage testified that he saw on the video Riggins, a black woman, and a black man exit a dark-colored Jeep SUV in front of the pool hall and head inside together on December 3, 2017. He testified that the other man was wearing a jacket with distinctive sleeve patches. The video further showed Riggins, the other man, and a woman leaving the pool hall and re-entering the Jeep later in the evening. Riggins's wife was called as a witness; she identified Riggins in the video footage from the pool hall. Another police detective identified the three people in the video as Riggins, Black—who had been described as the black man

4

or the other man in the earlier detective's testimony, and T.F., the female friend of Black's who accompanied them that night and who was described as the black woman in the earlier detective's testimony.

¶6      The State called another detective who discussed the content of the video surveillance footage from outside West Mineral Street as it was shown to the jury. The video footage showed a dark SUV stop on West Mineral Street near Riggins's residence; a passenger, who appeared to have reflective shoes, exited the SUV at the front of the house. The SUV then appeared to drive in the alleyway behind the house. The detective reviewed another clip, this one capturing the rear yard and alley. From the video footage, the detective identified three men near the alley: a man wearing a hat and a jacket with distinctive sleeves who appears to talk into a cell phone; a man wearing a hoodie; and the man wearing reflective shoes who exited the dark SUV in the earlier video clip.

¶7      The detective testified that the video from the alley view appeared to show there was a "physical confrontation … and then you see both the subject with the hoodie at one point have a firearm pointed towards the subject with the reflective shoes, and after the confrontation … then you see the person with the distinctive jacket and hat display a firearm[.]" The detective interpreted the video to show the man in the jacket with distinctive sleeves point a "pistol … at the person that is just off screen." The detective stated that in the video, there were "flashes which would indicate that the gun is being fired and then they appear to run off to the west … and … the subject with the distinctive jacket comes back on the screen momentarily … as if running backwards in the backyard."

¶8      The State also reviewed Black's custodial interrogation; relevant here, we note that the State only called a detective who conducted the first

5

interview. The detective testified that Black stated that he and Riggins had worked together for about a month before Riggins's death. Black told the detective that on the night of December 3, 2017, he met with Riggins and arranged to go out with him and a female friend, T.F. Riggins's drove the trio in Black's dark gray Jeep Liberty SUV because Riggins was more familiar with the area where they were going—a pool hall on South 27th Street. Black told the detective that at some point in the evening, Riggins borrowed Black's keys to the Jeep so he could retrieve something. Later, around 2:00 a.m. on December 4, 2017, Riggins drove Black and T.F. in the Jeep back to Riggins's residence on West Mineral Street. After chatting in the car, Riggins exited and went inside and then Black dropped T.F. at her home and then stopped at a gas station near North 43rd Street and West Capitol Drive. Black then told the detective that he noticed that he was missing $80 that had been in his vehicle and he suspected Riggins of stealing it. Black then called Riggins to ask about it. Riggins denied having the money and Black decided to let it go after arguing with Riggins. Black then went to his home on West Capitol Drive.

¶9 Cell phones were also key to the investigation and the State's evidence presentation. The State called another detective who testified that he forensically analyzed Black's cell phone and found no calls in the call log at any time between Black's phone and Riggins's cell phone number. A different detective testified that Black's cell phone records as obtained from the phone carrier showed multiple calls between Black's phone number and Riggins's phone number on December 3, 2017, as well as calls between 1:20 a.m. and 3:04 a.m. on December 4, 2017. An MPD officer testified that he analyzed cell communication records from Black's cell carrier account. The officer testified that Black's cell

phone records showed that his phone connected to cell phone towers in the area and at the time of Riggins's shooting.

¶10     Another significant fact was the distinctive jacket that appeared in both sets of surveillance video. The State called another detective, who testified that on December 11, 2017, he went to Black's girlfriend's house on West Capitol Drive to attempt to locate the jacket worn by a subject in the video footage. The girlfriend consented to the search; in a second floor closet, a jacket with distinctive patches on the sleeves that resembled the jacket in the videos was recovered. The detective then showed the recovered jacket in court. The State called the first detective again, who reviewed another segment of the surveillance video footage from the house on West Mineral Street, which showed the "subject standing near the tree with a distinctive jacket." Further, the subject in the video made a phone call.

¶11     On the third day of trial, trial counsel informed the trial court that attempts had been unsuccessful to serve two witnesses with subpoenas to testify. Trial counsel informed the court that Black was unhappy with the unsuccessful service and wanted trial counsel off the case. The court refused to remove trial counsel. The two witnesses were L.P., the sister of Black's girlfriend and the person named in his notice of alibi, and C.N., who was interviewed by police on the night of the shooting and reported seeing a Hispanic man involved in the shooting that night.

¶12     Black chose not to testify, and after deliberations, the jury returned a guilty verdict. The court entered the judgment of conviction. Upon the court asking if there was a request for a presentencing investigation, the State did not ask for one and trial counsel did not think one was needed.

¶13     In April 2019, trial counsel moved to withdraw because he and Black had become "antagonistic" and Black filed an OLR complaint against trial counsel.[4]  The court granted the motion to withdraw.  Sentencing was adjourned pending new counsel being appointed.

¶14     Black, with his fifth attorney, appeared at the sentencing hearing on June 26, 2019.  Black's attorney moved to withdraw, stating that communication had broken down with Black, who had been under the assumption that the attorney would file postconviction motions, when his appointment was for sentencing. However, Black told the court, "I'm ready to proceed.  I'm not going to continue with this."  After a short off-the-record discussion between sentencing counsel and Black, the sentencing hearing continued.

¶15     At the sentencing hearing, four members of Riggins's family addressed the court, expressing how good a person Riggins was, how much they missed him, and how they wanted heavy penalties for Black.  The State stated that Black's maximum exposure for the charged count of first-degree reckless homicide as a party to a crime was forty years of initial confinement and twenty years of extended supervision.  The prosecutor stated that it did not consider Black to be the "worst offender," but the jury found him guilty of killing Riggins as a party to the crime.   The State recommended twenty-five years of initial confinement and seven years of extended supervision.  Black's sentencing counsel proffered information about Black's regular employment and his care for his three daughters.  Black spoke to the court, stating that he was sympathetic to Riggins's

---

[4] The Office of Lawyer Regulation (OLR) is the division of the Wisconsin Supreme Court that receives and responds to inquiries and grievances relating to attorney misconduct, conducts investigations, and prosecutes violations of ethics rules. *See* SCR 21.01 (2021).

family, but he was not the person who killed Riggins. After reviewing its sentencing goals and the seriousness of the offense, the court imposed a term of twenty-five years of initial confinement and seven years of extended supervision.

¶16 In May 2021, Black filed a motion for postconviction relief under WIS. STAT. RULE 809.30 (2019-20).[5] In September 2021, the circuit court denied his motion, without a hearing. Black now appeals.

## DISCUSSION

¶17 On appeal, Black raises four issues that he argues requires a new trial or an evidentiary hearing. First, we will address Black's argument that the State's evidence was "wholly circumstantial" and insufficient for a jury to find him guilty beyond a reasonable doubt. Second, we will address Black's three ineffective assistance of counsel claims.

### I. *Sufficiency of the evidence*

¶18 Black argues that the State did not present sufficient evidence for the jury to have found him guilty beyond a reasonable doubt of the charged crime. "The question of whether the evidence was sufficient to sustain a verdict of guilt in a criminal prosecution is a question of law," which we review independently. *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. We "will uphold the conviction if there is any reasonable hypothesis that supports it." *Id.*

---

[5] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶19    "The burden of proof is upon the [S]tate to prove every essential element of the crime charged beyond reasonable doubt." *Bautista v. State*, 53 Wis. 2d 218, 223, 191 N.W.2d 725 (1971). "It is well established that a finding of guilt may rest upon evidence that is entirely circumstantial[.]" *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). "The credibility of the witnesses and the weight of the evidence is for the trier of fact." *Bautista*, 53 Wis. 2d at 223. "Although the trier of fact must be convinced that the evidence presented at trial is sufficiently strong to exclude every reasonable hypothesis of the defendant's innocence in order to find guilt beyond a reasonable doubt," on appeal, the reviewing court may not substitute its "judgment for that of the trier of fact unless the evidence, viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.". *See Poellinger*, 153 Wis. 2d at 503, 507. "If more than one inference can be drawn from the evidence, we must adopt the inference that supports the conviction." *State v. Long*, 2009 WI 36, ¶19, 317 Wis. 2d 92, 765 N.W.2d 557.

¶20    To prove first-degree reckless homicide as a party to a crime, the State must prove three elements: first, that Black "or a person he intentionally aided and abetted caused the death of []Riggins"; second, that Black "or a person he intentionally aided and abetted caused the death by criminally reckless conduct"; and third, that "the circumstances of [Black's] conduct or the conduct of the person he intentionally aided and abetted showed utter disregard for human life." *See* WIS. STAT. §§ 940.02(1); 939.05. The jury was instructed on those elements as well as Wisconsin law on liability "as a party to a crime," which requires that Black did so by "either directly committing" first-degree reckless

10

homicide or "by intentionally aiding and abetting the person who directly committed it." *See* § 939.05.

¶21    Our examination of the record supports that the State presented evidence sufficient for the jury to find this charge was proven beyond a reasonable doubt.[6]  The State established a motive for Black's actions—his suspicion that Riggins stole $80 from his vehicle.  The video surveillance footage obtained from the pool hall showed Black, Riggins, and T.F. arriving together and leaving together in a dark-colored Jeep.  The video surveillance footage from outside Riggins's West Mineral Street premises showed three men, each with distinctive clothing that was pointed out to the jury.  Although there was no video of one of the men being shot, there were flashes that indicated firing off-screen and the man with the distinctive jacket running away.  The shooting occurred where Riggins was found with multiple gunshot wounds.  The video surveillance footage from both locations showed a man in a jacket with distinctive sleeves—a jacket that was found in a search from the residence Black shared with his girlfriend and presented in court.  The jury could reasonably form conclusions about whether the jacket presented in court was the same jacket shown in both videos.

¶22    The cell phone carrier records showed calls between Black and Riggins, including a call near the estimated time of the shooting.  Black's call log record on his phone did not show those calls, which creates an inference that Black deleted the calls, the jury could reasonably infer that Black was conscious of

---

[6] We interpret Black to challenge that the State failed to prove beyond a reasonable doubt his identity as the person who directly committed the shooting or intentionally aided and abetted the person who did, in other words, the first element.  We do not interpret Black to specifically challenge that the State's evidence failed to show reckless conduct or utter disregard for human life, the second and third elements.

his guilt. The cell carrier records also mapped Black's phone to physically be near the site of the shooting.

¶23    Although Black argues that even when all of the circumstantial evidence is considered together, there was insufficient evidence to support the jury's finding that Black directly fired a gun at Riggins in either the front or back yard, or that Black had intentionally aided an abetted the person who did shoot Riggins. We disagree. Based on the evidence in the record, the jury could reasonably infer that Black went to Riggins's residence with an unknown third person in a dark Jeep-like SUV because he believed that Riggins's stole money from his car hours earlier, that Black and the other person confronted Riggins outside, and that Black or the other person shot Riggins causing his death. When reviewing the evidence, we consider it in the light most favorable to the conviction, and we conclude that there is sufficient evidence to support the jury's verdict. *See* **Poellinger**, 153 Wis. 2d at 501. Accordingly, Black's postconviction claim fails.

## II.    *Ineffective assistance of counsel*

¶24    Black's second set of claims are based on his allegation that his counsel was ineffective.[7] His first claim is that his attorney should have moved to suppress his second statement to the police in his custodial interrogation on

---

[7] Black had several attorneys represent him. It is not entirely clear from the record whether Black's first claim arises out of his third attorney's conduct, who represented him during pretrial motions, or his fourth attorney, who represented him at trial. We do not distinguish between the attorneys because our analysis is the same.

December 8, 2017.[8]  Second, he contends that trial counsel failed to secure two witnesses vital to his defense.  Third, he argues that sentencing counsel was ineffective at sentencing.

¶25  "A claim of ineffective assistance of counsel is a mixed question of fact and law." *State v. Carter*, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695.  We will sustain the circuit court's factual findings unless they are clearly erroneous.  *State v. Thiel*, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305.  We independently review as a question of law whether counsel was ineffective. *Id.*, ¶24.

¶26  To prove ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the defendant was prejudiced by counsel's performance.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "Counsel's conduct is constitutionally deficient if it falls below an objective standard of reasonableness." *Thiel*, 264 Wis. 2d 571, ¶19.  To prove that counsel's deficient performance prejudiced his defense, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  In our analysis, we "may reverse the order of the two tests or avoid the deficient performance analysis altogether if the defendant has

---

[8] We note here that Black argues that the police violated his Fifth Amendment right to counsel when it continued a second custodial interrogation after he invoked his right to counsel. He contends that his second statement to police should be suppressed.  However, Black did not move to suppress the statement; therefore, this claim must be addressed through the rubric of ineffective assistance of counsel. *See State v. Carprue*, 2004 WI 111, ¶47, 274 Wis. 2d 656, 683 N.W.2d 31.

13

failed to show prejudice" from counsel's performance. *See **State v. Johnson***, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

### A. *Failing to move to suppress Black's second statement to police*

¶27 Black argues that he invoked his Fifth Amendment right to counsel during the second custodial interrogation with MPD detectives; however, the detectives did not stop questioning him. When a subject of a custodial interview makes an "unequivocal, unambiguous invocation of the right to counsel," ***State v. Edler***, 2013 WI 73, ¶32, 350 Wis. 2d 1, 833 N.W.2d 564, then the accused "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." ***Edwards v. Arizona***, 451 U.S. 477, 484-85 (1981); *see also **Miranda v. Arizona***, 384 U.S. 436, 479 (1966). Therefore, Black contends his second statement should be suppressed and that defense counsel was ineffective for failing to move to suppress that statement.

¶28 We begin with the record: In Black's second custodial interrogation, he was again advised of his ***Miranda*** rights, but chose to talk to two MPD detectives. The record reflects that Black raised the idea of needing a lawyer multiple times. Early in the conversation Black asked one of the detectives if he should have a lawyer, to which the detective replied, "No." Later in the conversation, Black said, "I know time is very important, but … I'm not going to sit here and be an asshole. 'Well, I need a lawyer.'" Then, when the detectives discussed the types of homicide charges possible, one detective stated, "This is the opportunity to explain that things didn't go as planned: that this wasn't a planned thing; that he wasn't supposed to die." Black expressed, "But these are things that I don't understand, and I definitely would need a lawyer for that." The detective

replied, "Okay." The interview continued, and Black again stated, "I didn't want to come here and be like, 'Yeah, I need a lawyer.' You know what I'm saying?" Finally, Black stated, "I don't know what he wants me to tell him…. If I would say anything else, I will have to have a lawyer." When Black's statements were discussed with regard to any evidentiary concerns at hearings in December 2018 and January 2019, Black's attorney dismissed any concerns and did not file a suppression motion about Black's statements.

¶29     Although Black argues that his attorney was ineffective for failing to file a suppression motion on the second statement, the State contends that his arguments fail because he suffered no prejudice because the jury did not hear any evidence arising out of the second interview. Black argues that the second statement placed him in contact with Riggins, established a motive for the shooting, and gave the police the location to retrieve the black jacket with distinctive sleeves. However, the record reflects that the State introduced Black's contact with Riggins and the motive for the theft through testimony from the detective who conducted his first custodial interview. The State did not call as a witness either detective who conducted the second interview. Because the jury did not hear the disputed evidence, trial counsel's failure to move to suppress Black's second interview statement could not and did not prejudice his defense.

¶30     Beyond the issue of Black failing to show prejudice from the second interview, the State argues that Black's claim about giving the location of the jacket is misleading. Black does not provide a citation to where in the record he told police about the location of the jacket. The police report on the second interview reflects that Black told police he was wearing a black jacket "with patches on the sleeves" on the night of the incident, but there is no point in which Black tells the police where to find the jacket. Further, the police reports reflect

that after Black's second interview, the police attempted to search for the jacket at two locations on different days, December 9 and 11, 2017. The police came up empty on December 9, 2017, at the first location, but did eventually find the jacket at a second location on December 11, 2017. Only the second search was raised in police testimony during trial. If Black had truly informed the police of the jacket's location, logically there would not have been an unsuccessful attempt to recover the jacket. Therefore, the record reflects that it is a reasonable inference that Black's statement was not the source of the jacket's location.

¶31 Even if we assume without deciding that Black made an unambiguous request for counsel during the second interview, Black's claim fails. *See State v. Jennings*, 2002 WI 44, ¶27, 252 Wis. 2d 228, 647 N.W.2d 142 (explaining that "clear and unequivocal requests for counsel during custodial interrogation" require the police to stop questioning a subject). Black has not made a showing of prejudice. His two specific complaints are contradicted by the record. Black has not shown that the State presented his second statement or relied upon it, in fact Black concedes that the State did not directly present his second statement. Black has not shown that the second statement to police should undermine confidence in the verdict. Having failed to make a showing on the prejudice prong of *Strickland*, we decline to review the deficiency argument. We conclude that Black's first claim for ineffective assistance of counsel fails.[9]

---

[9] The circuit court determined that Black's references to a lawyer during the second custodial interview did not constitute "an actual unambiguous and unequivocal invocation of a right to counsel." Under that view, the circuit court concluded that defense counsel's decision not to file a suppression motion was neither deficient nor prejudicial.

¶32    Accordingly, we conclude that the record conclusively demonstrates that Black is not entitled to relief; therefore, the circuit court acted within its discretion when it denied his postconviction claim without a hearing. "A hearing on a postconviction motion is required only when the movant states sufficient material facts that, if true, would entitle the defendant to relief." *State v. Allen*, 2004 WI 106, ¶14, 274 Wis. 2d 568, 682 N.W.2d 433. "However, if the motion does not raise facts sufficient to entitle the defendant to relief, or if it presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." *State v. Ruffin*, 2022 WI 34, ¶35, 401 Wis. 2d 619, 974 N.W.2d 432.

### B. Failing to call two witnesses

¶33    Black argues that trial counsel was ineffective for failing to secure the presence of two witnesses, C.N. and L.P. Black argues that C.N.'s and L.P.'s statements to police showed each woman would have been an important witness in Black's defense.

¶34    First, we consider C.N. and turn to the police reports that contain her statement to the police. The report reflects that C.N. told police she was smoking in her bedroom window at approximately 3:03 a.m. "when she heard three gunshots." C.N. stated she was also able to see West Mineral Street "and saw the muzzle flash of a handgun." C.N. "stated she observed a Hispanic male, 20-29 years old, 150 lbs, slim build, 5'5"-5'6" tall wearing a black hooded sweatshirt with the hood up and black pants running westbound on the north sidewalk[.]" She then stated she looked out another window and observed the subject "running northbound" and then "eastbound in the alley." C.N. "stated she then heard five

17

more gunshots coming from the rear alley near her house." C.N. did not see any other subjects. In Black's postconviction motion, he asserted that a private investigator engaged by the defense spoke with C.N. on August 17, 2018, and she clarified that the man may have been Hispanic, not that he was definitely Hispanic. Black's argument here arises out of a potential alibi because he is a black man, not Hispanic, and in any case he did not fit the description of the shooter given by C.N.

¶35     The circuit court concluded that C.N. was not an actual eyewitness to Riggins's death and that Black was charged as a party to the crime. The State presented evidence of a third person at the location of the shooting. Therefore, the circuit court concluded that Black's defense was not prejudiced by the failure to produce C.N. On appeal, Black argues that the circuit court's conclusion interfered with the jury's role as the arbiter of credibility and fact finder. He argues the jury should have determined whether C.N.'s account of the shooting raised reasonable doubt of Black's guilt.

¶36     The State argues that C.N.'s testimony would not have "helped," in other words, having the jury hear C.N.'s testimony would not have resulted in a reasonable probability of a different outcome: she was not an eyewitness to the whole crime—she reported hearing more gunshots than she saw out of the window. C.N.'s testimony provided a limited snapshot of what transpired that night and it did not create reasonable doubt regarding Black's involvement. The State did not allege that Black was the only person involved in Riggins's death; rather, it charged him as a party to a crime. Based on the surveillance video footage presented, C.N.'s observation of a possibly Hispanic male with a gun does not undermine the evidence that Black participated in Riggins's homicide. The video showed another man with a gun was present at the time of the shooting, and

that man was wearing the same distinctive jacket that Black was identified as wearing at the pool hall in that video footage. Our examination of the record supports that there was no reasonable probability of a different outcome if the jury had heard C.N.'s testimony.

¶37 Turning to the second witness, L.P.'s statement to police arises out of a visit from an MPD detective to her home on Grant Street on December 9, 2017, to interview L.P. and to search for the jacket with the distinctive sleeves. The police report stated that L.P. allowed the police inside, explained that she was Black's girlfriend's sister. She told police that "sometime in the middle of the night" in the early hours of December 4, 2017, she was awakened by a knock on the back door. She found Black alone at the back door knocking, even though he had a code to open the door. She allowed him inside the house and went back to bed. He was not there when she woke up and she did not know how long he was there.

¶38 The circuit court stated that failing to secure L.P. was not prejudicial because she could not provide an effective alibi for Black. By contrast, Black argues that his second attorney filed a notice of alibi in August 2018 that alleged L.P. could provide an alibi. Black argues that counsel has a duty to make reasonable investigations in the case; therefore, he asserts trial counsel was ineffective for failing to investigate L.P. and attempt to pinpoint the alibi. Similar to our considerations of C.N.'s possible testimony, L.P.'s possible testimony does not undermine our confidence in the verdict. Black has characterized L.P. as an alibi witness. "The word, 'alibi,' is merely a shorthand method of describing a defense based on the fact that the accused was elsewhere at the time the alleged incident took place." *State v. Brown*, 2003 WI App 34, ¶13, 260 Wis. 2d 125, 659 N.W.2d 110 (citation omitted). In Black's notice of an alibi defense, he claimed

19

that L.P. would testify that Black was with her at her home on Grant Street at the time of the shooting. The record of L.P.'s statement to police does not support this assertion. Further, Black told the police in his first custodial interview that he went to his West Capitol Drive residence and was sleeping there at the time of Riggins's death. If L.P. testified that Black was with her at that time at another address, the police testimony would contradict that claim. The State contends that by any objective standard, L.P.'s testimony would have undermined Black's credibility because it would have shown that he lied to police about his whereabouts when Riggins was killed. Therefore, there is no reasonable probability of a different outcome if the jury had heard L.P.'s testimony.

¶39    Our examination of the record supports the circuit court's determination that the failure to produce either witness was not prejudicial. We conclude that Black has not adequately pleaded that there was a reasonable probability that the outcome of the trial would have been different if the jury had heard either woman's testimony; therefore, we conclude that Black's second claim of ineffective assistance of counsel fails. *See Strickland*, 466 U.S. at 694. Again, we also conclude that the circuit court acted within its discretion when it denied Black's postconviction motion without a hearing. Black failed to allege sufficient material facts to support his motion, relying on conclusory allegations and speculation. *See Allen*, 274 Wis. 2d 568, ¶9.

*C. Failing to provide effective representation at sentencing*

¶40    Black argues that he received ineffective assistance of counsel in three ways related to his sentencing: First, he argues trial counsel failed to request a presentence investigation (PSI) after judgment was entered and sentencing counsel did not request one before sentencing commenced, which prevented the

trial court from learning mitigating factors to the case. Second, he alleged that his fifth attorney's limited contact with Black before the sentencing hearing made him unprepared to effectively represent Black. Third, he asserts that sentencing counsel failed to obtain Black's consent before making his sentencing recommendation.

¶41 Addressing Black's first issue about the failure to request a PSI, we note that Black has not cited any authority to support his argument that counsel is required to request a PSI or that a court is required to order one. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered."). In fact, WIS. STAT. § 972.15(1) states that "[a]fter a conviction the court may order a presentence investigation[.]" Thus the use of presentence investigations and reports is "encouraged" but "they are not necessarily required" under Wisconsin law. *Sprang v. State*, 63 Wis. 2d 679, 686, 218 N.W.2d 304 (1974).[10] Black has failed to show that an attorney has a duty to request a PSI. *See State v. Breitzman*, 2017 WI 100, ¶49, 378 Wis. 2d 431, 904 N.W.2d 93 (concluding that counsel does not perform deficiently unless an attorney failed to perform a clear duty under the law). Therefore, Black's argument fails that counsel's representation was ineffective for failing to request a PSI.

---

[10] Black argued that *State v. Reinwand*, 2019 WI 25, ¶¶47-48, 385 Wis. 2d 700, 924 N.W.2d 184, supported his position that the failure to request a PSI was deficient performance. We caution appellate counsel that she mischaracterizes the legal holdings of that case. In *Reinwand*, the defendant argued that the failure to request a PSI was deficient, and the *Reinwand* court did not affirm that conclusion. Instead, it concluded, "Assuming without deciding or implying that counsel's performance at sentencing was deficient, we conclude that Reinwand was not prejudiced by counsel's alleged errors." *Id.*, ¶47.

¶42     Black's second issue is a complaint that counsel did not meet with Black for a sufficient time to adequately prepare for the sentencing hearing.  His third issue is that counsel did not obtain Black's consent for his sentencing recommendation strategy.  We address and reject both of these arguments because Black's own conduct was responsible for counsel's failure to consult with him.  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691.  The State contends that Black's allegations ignore how Black's own conduct limited any of his attorneys' ability to effectively represent him.

¶43     We return to the record.  First, Black filed a grievance against his trial counsel before the first sentencing hearing, which precipitated an adjournment and appointment of new counsel.  Second, when Black's sentencing counsel attempted to prepare for the sentencing hearing instead of filing postconviction motions challenging the verdict, sentencing counsel reported to the court on the record that Black "became very angry" with counsel, did not want to discuss sentencing-related issues with his attorney, and ended the meeting.  Third, when the trial court asked Black about counsel's claim that communications broke down, Black told the court that he was "ready to proceed" with sentencing.  Fourth, after the court gave counsel and Black twenty minutes to confer off-the-record, both Black and his counsel told the court that they were ready to proceed and Black told the court that he felt counsel and he had enough time to talk about the sentencing.

¶44     The record reflects that sentencing counsel (and trial counsel before him) acted reasonably in representing Black with regard to sentencing.  "If a defendant selects a course of action, that defendant will not be heard later to allege error or defects precipitated by such action.  Such an election constitutes waiver or

22

abandonment of the right to complain." *State v. Krancki*, 2014 WI App 80, ¶11, 355 Wis. 2d 503, 851 N.W.2d 824 (citation omitted). We conclude that Black has waived his right to complain. Black has not "overcome the strong presumption of reasonableness" of counsel's strategy or demonstrated that counsel's actions were "irrational or based on caprice." *See Breitzman*, 378 Wis. 2d 431, ¶65. We conclude that Black's final claim of ineffective assistance of counsel also fails.

¶45 Finally, we again conclude that the circuit court acted within its discretion when it denied Black's postconviction motion without a hearing. Black failed to allege sufficient material facts to support his motion, relying on conclusory allegations and speculation. *See Allen*, 274 Wis. 2d 568, ¶9. Further the record conclusively demonstrates that Black is not entitled to relief. *See Ruffin*, 401 Wis. 2d 619, ¶35.

## CONCLUSION

¶46 For the reasons stated above, we affirm Black's judgment of conviction and the circuit court's denial of his motion for postconviction relief.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.